RMT/DMP/SK/AC
F.#2015R00600

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA                          Docket No. 15 CR 268 (S-2) (BMC)

    - against -

MUHANAD MAHMOUD AL FAREKH,

         Defendant.

– – – – – – – – – – – – – – – – –X


SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA


                    RICHARD P. DONOGHUE
                    UNITED STATES ATTORNEY
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201


Richard M. Tucker
Douglas M. Pravda
Saritha Komatireddy
Assistant U.S. Attorneys

Alicia Cook
Trial Attorney
Counterterrorism Section
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ..............................................................................................................3

I.    Al-Qaeda .............................................................................................................3

II.   The Evidence at Trial .........................................................................................3

    A.  The Defendant's Path to Radicalization.................................................4

    B.  The Attack on FOB Chapman ..................................................................6

    C.  The Defendant's Material Support to Al-Qaeda .........................................8

    D.  The Defendant's Handwritten Letters ....................................................8

III.  Procedural Posture and the Applicable Guidelines Calculation. ....................................10

ARGUMENT ................................................................................................................12

I.    The Legal Framework ........................................................................................12

II.   The Nature and Seriousness of the Defendant's Crimes Support a
      Sentence of Life Imprisonment ........................................................................13

III.  A Sentence of Life Imprisonment is Appropriate to Serve the
      Purposes of Specific and General Deterrence .................................................15

IV.   A Sentence of Life Imprisonment is Appropriate to Protect the Public from
      Further Crimes by the Defendant ......................................................................17

V.    The History and Characteristics of the Defendant Also Support a Life Sentence..........17

VI.   A Life Sentence Would Be Consistent with Sentences Imposed in Similar Cases ........18

CONCLUSION...............................................................................................................20

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum in connection with sentencing, which is scheduled for March 7, 2018 at 10:00 a.m.  On September 29, 2017, following a three-week trial, the jury found the defendant guilty of all charged counts, covering seven years of terrorist conduct wherein the defendant rose to a leadership role in al-Qaeda and participated in a complex vehicle-borne improvised explosive device ("VBIED") attack on a U.S. military base in Khost, Afghanistan that resulted in injuries to one U.S. serviceman and numerous Afghan nationals.

This defendant, who was born in the United States, came from an upper-income family that afforded him the opportunity to attend university in Canada, receive a college degree, and eventually contribute positively to the world, if he so chose.  But the defendant rejected that opportunity, and instead chose to embrace a radical, jihadist ideology.  Together with his friends, he supported hatred and violence, and then traveled overseas with the goal of murdering U.S. soldiers.

Once in the Federally Administered Tribal Areas, he thrived.  Thanks to his familiarity with the West, the defendant ascended to play a crucial role in al-Qaeda's elite external operations group, which specialized in planning and executing attacks against the United States and its Western allies.  One of those attacks was the attack on Forward Operating Base Chapman, which – if it had succeeded as planned – could have resulted in the deaths of many American servicemen and women, among others.  After more than six years in al-Qaeda, even after being forced to live largely in hiding to avoid being captured or killed, the defendant still clung to his violent ideology, writing to other al-Qaeda members of his desire to next travel

to Syria so that he could continue to wage jihad.  His ceaseless campaign of terror ended only when he was captured and brought to the United States to face trial.

The seriousness of the defendant's offenses and the need for just punishment and deterrence cannot be overstated.  The Court should impose a sentence of life imprisonment.

BACKGROUND

I.      Al-Qaeda

        Al-Qaeda is a militant Islamist terror organization that was founded in the late

1980s by Usama bin Laden.  In 1999, the United States Department of State formally designated

al-Qaeda as a foreign terrorist organization.  In February 1998, al-Qaeda's leadership issued the

following worldwide directive:

> In compliance with God's order, we issue the following fatwa to all
> Muslims: the ruling to kill the Americans and their allies—civilians
> and military—is an individual duty for every Muslim who can do it
> in any country in which it is possible to do it.

        In the years following this decree, al-Qaeda carried out numerous large scale

attacks against the United States and other Western interests, from its base in Taliban-controlled

Afghanistan, including (1) the 1998 bombings of the U.S. Embassies in Kenya and Tanzania,

which resulted in more than 200 deaths and more than 4,000 injuries; (2) the 2000 bombing of

the U.S.S. Cole in Yemen, which resulted in scores of casualties; and (3) the September 11, 2001

attacks on the World Trade Center and the Pentagon, which resulted in approximately 3,000

deaths on that day.

II.     The Evidence at Trial

        The evidence at trial established the following:  First, while attending the

University of Manitoba, the defendant came to embrace a violent, extremist view of Islam, which

eventually led him to travel to the Federally Administered Tribal Areas of Pakistan and

Afghanistan (the "FATA") with the goal of murdering U.S. and coalition soldiers.  Second, while

overseas, the defendant participated in the construction of at least one massive truck bomb that

was used in an attack on Forward Operating Base ("FOB") Chapman in January 2009.  This

attack, if it had not been thwarted by vigilant base security forces and luck, would have caused

catastrophic damage to the base and untold casualties.  Third, the defendant was a member of

and provided material support to al-Qaeda, wherein he served as a member of the terrorist

group's external operations unit, and later was a member of al-Qaeda's Abu Bakr al-Saddiq

combat battalion.

    A.    The Defendant's Path to Radicalization

        The defendant was born in Houston, Texas in 1985 (GX 1102) and grew up in

Dubai (GX 1103D, 1103E).  Between approximately 2005 and 2007, he attended the University

of Manitoba, in Canada, where he joined the Muslim Students Association and became friends

with coconspirators and later fellow al-Qaeda members Ferid Imam and Maiwand Yar.  (Tr. 509-

13).  In December 2006, the defendant traveled to Saudi Arabia on a religious hajj trip with

Imam, Yar and other students from the University of Manitoba.  (Tr. 523-27).  Thereafter,

between December 2006 and March 2007, the defendant, Imam and Yar watched video

recordings encouraging violent jihad, listened to jihadist lectures, including lectures by now-

deceased al-Qaeda in the Arabian Peninsula ("AQAP") leader Anwar al-Aulaqi, and engaged in

discussions reflecting their support for violent Islamist extremism.  (Tr. 539-40; GX 503).

Indeed, on February 18, 2007, the defendant sent an email to his father wherein he wrote, "call

and ask for the hereafter and if ibraheam [the defendant's brother] likes it get the rest of the

lessons" and then included a link to a website offering Anwar al-Aulaqi lectures for download.

(GX 819).  On February 24, 2007, the defendant watched and exhorted one of his coconspirators

to watch a video by an al-Qaeda affiliate that depicted and glorified the killing of American

soldiers.  (GX 503).

        In early 2007, the defendant, Imam and Yar made plans to drop out of college and

travel to Pakistan to wage violent jihad.  They filled out visa applications (GX 1408, 1409, 1410)

and made preparations that reflected that they did not intend to return to Canada.  The defendant

then visited Sahara Travel, a travel agency in Winnipeg, where he purchased the airline tickets

for himself, Imam and Yar.  (Tr. 859-860).  Thereafter, on or about March 8, 2007, the

defendant, Imam and Yar flew from Winnipeg, Canada, to Karachi, Pakistan.  (GX 1411, 1412,

1413).  Although their tickets had a return date of April 8, 2007, none of the three men used the

return portions of their purchased airline tickets.  (GX 1310-B; Tr. 340).

Following their arrival in Pakistan, the defendant, Imam and Yar made their way

to the FATA.  The defendant sent two messages to his father after arriving in Pakistan.  First, on

March 12, 2007, the defendant's father received an email from the defendant in which the

defendant wrote, inter alia:

> Dad how are you and how is the family? I hope everyone is doing
> well. I just wanted to tell you that everything is very good.
> Pakistan is an amazing country and the people are very welcoming
> and nice. InshaAllah I am going to be doing some more site seeing
> as well as hiking and the rest of the out doors. also be looking at
> the univeristies here if they are good and what not. Send my
> Salaams to all.

(GX 821).

Thereafter, on May 28, 2007, the defendant's father received an email signed

"Saifullah."  The email, which was written by the defendant, read in relevant part:

> This is Saifullah. First of all I would like to say I am sorry that I
> wasn't able to send email as soon as possible. Things here were a
> little busy and things needed time to be done. I just wanted to tell
> you that I am doing well and everything here is more than what I
> expected it to be and I am learning a lot. Alhamdulillah I was able
> to live up to some of the promises that I made. . . . I hope that
> Ibrahem [the defendant's brother] is taking some responsibilities
> and is holding his religious responsibilities toward his parents(we
> all know that this is not an easy responsibility). I hope that he is
> taking his religious seriously and the least the least he can do is
> take care of his 5 daily prayers. As for the rest of household, I hope
> that the tv is thrown out of the house and that the household should

5

> start spending time with one another and going out and eating
> dinner together. And on Fridays the family should get together.
> And on Fridays, to hold some halaqa [a religious gathering or
> meeting for the study of Islam and the Quran] and remind
> eachother of their purpose in life.

(GX 824).

The defendant's co-conspirators joined al-Qaeda with him.  Imam later became a

weapons trainer in the al-Qaeda external operations division weapons training camp in the FATA

where he trained others – including other Americans who also joined al-Qaeda – how to maintain

and fire machineguns, pistols and rocket-propelled grenades.  There, he adopted the kunya

"Yousef" and told trainees in mid-2008 that he had been in the FATA for approximately one

year, had enlisted in the external operations program, and had not yet been sent by al-Qaeda to

fight in Afghanistan.  (Tr. 986-88).

In February 2009, Yar sent a letter to his family in which he told his family

members that he had been with al-Qaeda, referred to members of al-Qaeda as being "the best

people in the world," and instructed his family not to believe what the media reported about al-

Qaeda and other extremist groups.  Yar encouraged his family to come to Pakistan to visit him,

but only if they were not going to try to persuade him to return to Canada.  Yar also wrote that if

his family were to visit him, they should not tell anyone.  (GX 1202).  Yar's family later received

information that he had been killed in Pakistan.  (Tr. 665-66).

> B.    The Attack on FOB Chapman

In January 2009, the defendant helped to build a VBIED used in an attack on FOB

Chapman, a U.S. military installation that served as the base for the U.S. Provincial

Reconstruction Team ("PRT") in Khost, Afghanistan.  (Tr. 51-52).  The PRT's primary mission

was to work alongside Afghan nationals to develop the region's infrastructure, and personnel in

the base regularly conducted outreach to local civilians, such that the base was a well-known U.S. outpost.  (Id.).

On January 19, 2009, two vehicles approached the fence line of FOB Chapman. The attack plan was evidently for the first vehicle to detonate at the gate, so that the second vehicle – a truck following closely behind that was carrying significantly more explosive ordinance than the first vehicle – could enter FOB Chapman and detonate inside the base to maximize casualties and damage.  (Tr. 59-64).  At the gate, the first vehicle exploded after its operator detonated the VBIED.  The second vehicle drove into and became stuck in the blast crater caused by the first explosion.  The driver then abandoned his vehicle without detonating its VBIED.  Shortly thereafter, he was shot and killed by local security personnel who were guarding the perimeter of FOB Chapman.  (Id.).

Both VBIEDs were powerful.  The initial detonation injured several Afghan nationals, including at least one pregnant woman who was receiving medical treatment at a clinic near the base entrance and an Afghan soldier who lost his vision in one eye when shrapnel penetrated his eye.  (Tr. 772-76).  The shockwave knocked back a U.S. soldier who was standing approximately 50 yards away.  (Tr. 1349-50).  The second, undetonated VBIED was significantly larger and more powerful than the first, incorporating approximately 7,500 pounds of ammonium nitrate and other bulk explosive material, including several bombs and military ordinance to increase the device's fragmentation and lethality.  (Tr. 123).

Forensic technicians in Afghanistan were subsequently able to recover numerous latent fingerprints from adhesive packing tape used to bind together the explosive materials of the second, undetonated VBIED.  Biometric comparison revealed 18 of those fingerprints matched to the defendant.  (Tr. 459-467).  Technicians also were able to recover a hair follicle

from the undetonated VBIED, and analysis indicated that the follicle's mitochondrial DNA was consistent with that of the defendant.  (Tr. 362-66).

      C.     <u>The Defendant's Material Support to Al-Qaeda</u>

      The defendant came to be a member of al-Qaeda's external operations group, where he associated with other al-Qaeda leaders and assisted in the day-to-day administration of that wing of the terrorist organization.  Specifically, the defendant worked initially for Abdul Hafeez al-Somali ("Abdul Hafeez") and was known within al-Qaeda to have succeeded Abdul Hafeez in some capacities after Abdul Hafeez was killed.  (Dep. Tr. 45-49).  Among the defendant's duties was collecting money for distribution to al-Qaeda external operations fighters. As a result of serving in this role, the defendant came to be very concerned about his safety, as he perceived he could be targeted, given his importance within al-Qaeda.  (Dep. Tr. 49-50). Consequently, the defendant avoided appearing in public, and was viewed as extremely security conscious by other al-Qaeda members.  (Dep. Tr. 143).  By 2013, the defendant was considering fleeing the FATA, and sought guidance from al-Qaeda's leadership about his future within the organization.  (<u>See</u> GX 708).  Thereafter, in late 2014, he was arrested in Pakistan and was subsequently transferred to the custody of U.S. authorities.

      D.     <u>The Defendant's Handwritten Letters</u>

      During the summer of 2015, Afghan authorities seized a large volume of computer data storage devices that were in the possession of another individual (not the defendant, who had been returned to the United States several months earlier).  Thereafter, in September 2015, those seized devices were provided to a Federal Bureau of Investigation ("FBI") agent stationed in Kabul, Afghanistan.  (Tr. 895-96).  Subsequent forensic analysis by FBI computer technicians revealed that, among the seized devices, a USB drive contained

scanned images of handwritten letters that someone had previously attempted to delete.  Many of

these letters written in 2013, were signed in Arabic text "Abdullah," "Abdullah al-Shami" or

"Abdullah al-Shami, Abu Bakr Battalion" and described, <u>inter alia</u>, the author's activities to

communicate with al-Qaeda leadership, his efforts to avoid detection by U.S. or other

government authorities, and his desire to relocate to Syria to continue fighting jihad.  (<u>See</u> GX

701-719).  For example, a letter dated March 3, 2013 contained the following:

> How are you doing Bro, wassup, I havent heard from you in ages.
> what's happening with you? I wanted to thank you for all the help
> you gave me (in building me house to Buy the kids things) and lots
> more.  I ask Allah to reward you with the highest levels of . . .
> Jannah [referring to paradise].  Bro if there is anything I can do for
> you. Don't hesitata to ask. (But know my powers are very limited
> LOL)
>
> I don't have many storys to tell other than Being locked up in my
> house for almost 3 months. But I am pretty sure you have tons.
> write Back Bro and sent through regular alquida mail.

(GX 702).  Another letter dated May 1, 2013 stated:

> I really want to travel to Syria, seeing that the situation here is very
> confusing, or at the very least I am very confused, what I have
> been seeing in the last [illegible] amount of years is for Brothers
> that are working they are getting killed, and for those who are not
> doing anything then why on earth are they still here. (Just as extra
> info I am in the group that is doing absolutely nothing). you might
> then rais the argument that afghanistan is right around the corner
> but the bitter truth is the fact that the taliban themselves don't
> really have a need for us, they would much favor a smaller more
> symbolic number of fighters from the current amount of foren
> fighters currently available.

(GX 708).  Another letter, dated May 28, 2013, stated, "as for my house I am not very happy. I

don't feel very <u>secure</u> here…. (GX 713 (emphasis in original)).  Another letter, dated August 2,

2013, told the recipient to send any response through "Administration miran sha" in Waziristan,

which is located in the FATA.  (GX 705).  Another letter, also dated August 2, 2013, stated:

> Bro when I read your letter I got one Question to ask you. you said
> in the letter that you wrote to the leadership about my situation, but
> when you came over last time I understood from you, that you
> were going to write in the future.

(GX 707).  Handwriting comparison analysis, together the content of these letters, established

that the defendant wrote these letters.  The letters reflect the defendant's use of al-Qaeda mail to

communicate with other members of the terrorist organization, his membership in al-Qaeda, the

defendant's fear for his safety and his efforts to live in hiding so he would not be captured or

killed, and the defendant's continuing desire to wage jihad where he could be more useful in

Syria.

III.   Procedural Posture and the Applicable Guidelines Calculation

On September 29, 2017, following a three-week trial, the jury convicted the

defendant on all counts.  The counts of conviction are:

- use of explosives, in violation of Title 18, United States Code, Section 844(f)(1);

- conspiring to murder U.S. nationals, in violation of Title 18, United States Code, Section 2332(b)(2);

- conspiring to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a(a)(1);

- conspiracy to use a weapon of mass destruction by a U.S. national, in violation of Title 18, United States Code, Section 2332a(b);

- conspiring to bomb a U.S. government facility, in violation of Title 18, United States Code, Section 2332f(a)(2);

- conspiring to provide, attempting to provide and providing material support to terrorists, in violation of Title 18, United States Code, Section 2339A(a); and

- conspiring to provide, attempting to provide and providing material support to al-Qaeda, in violation of Title 18, United States Code, Section 2339B(a)(1).

Based on these convictions, and as set forth in the Presentence Investigation

Report ("PSR"), the defendant's total offense level is 61, and he falls under Criminal History

Category VI.  (PSR ¶ 88).  Accordingly, the advisory Guidelines sentence is life imprisonment.

(Id. ¶ 111).[1]

---

[1] The PSR incorrectly reflects that the defendant faces a maximum term of supervised release of five years on Counts One through Five, and three years on Counts Six through Nine.  (PSR ¶ 112).  Pursuant to Title 18, United States Code, Section 3583(j), the defendant faces a maximum life term of supervised release on each count of conviction.

ARGUMENT

I.      The Legal Framework

The Guidelines still provide strong guidance to the Court in light of United States

v. Booker, 543 U.S. 220 (2005) and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

Although Booker held that the Guidelines are no longer mandatory, it held also that the

Guidelines remain in place and that district courts must "consult" the Guidelines and "take them

into account" when sentencing.  Booker, 543 U.S. at 264.  As the Supreme Court stated, "a

district court should begin all sentencing proceedings by correctly calculating the applicable

Guidelines range" – that "should be the starting point and the initial benchmark."  Gall v. United

States, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors

outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the

offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four

legitimate purposes of sentencing, see id. § 3553(a)(2); "the kinds of sentences available," id. §

3553(a)(3); the Guidelines range itself, see id. § 3553(a)(4); any relevant policy statement by the

Sentencing Commission, see id. § 3553(a)(5); "the need to avoid unwarranted sentence

disparities among defendants," id. § 3553(a)(6); and "the need to provide restitution to any

victims," id. § 3553(a)(7).  See Gall, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a

sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing,

which are:

> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the applicable Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," Rita v. United States, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall, 552 U.S. at 46; see also Rita, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50.

II.   The Nature and Seriousness of the Defendant's Crimes Support a Sentence of Life Imprisonment

For this defendant – a terrorist leader who supported acts of violence aimed at killing U.S. soldiers and government aid workers overseas – "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and "the seriousness of the offense," id. § 3553(a)(2)(A), are

by far the most relevant sentencing considerations.  The nature of the defendant's offenses merits

a sentence of life imprisonment.

First, the attack on FOB Chapman was extremely serious.  As U.S. Navy

Commander John Barrett testified at trial, FOB Chapman was an active U.S. facility in Khost at

the time of the January 2009 attack.  (Tr. 54-55; GX 649).  The PRT housed there was tasked

with assisting the local population:

> Our job was to be essentially the constructors, the general
> contractors, if you will, for the province.  So we were involved in
> all manner of infrastructure construction to include hospitals,
> clinics, railroads, schools, government compounds, district sub-
> governor facilities, et cetera, all by way of ensuring the
> infrastructure existed to compliment that governance mission of
> ensuring that Government was being more responsive to the
> community's needs.
>
> …
>
> We also had -- for our development piece, we had a representative
> of the U.S. Agency for International Development, USAID, and
> she was there to help with the project selection, project
> development, et cetera, and making sure that the Afghan
> Government would then be able to take it over and sustain it
> because we had built it.  And then finally we had a representative
> from the U.S. Department of Agriculture, since agriculture was
> such a big industry in Khost.  He was there to mentor and to make
> sure that the latest ideas in agriculture were available to local
> farmers so they can maximize their harvest and their income and
> their standard of living.

(Tr. 42-43).

The attack on the base resulted in critical injuries to numerous local Afghan

woman and children who were at the base to receive prenatal care.  (Tr. 772-74).  One woman

was struck with a large piece of metal shrapnel that became embedded in her back.  (Id.).  An

Afghan soldier also lost his vision in one eye when shrapnel from the attack embedded in his

eye.  (Tr. 774-76).  Luckily, Private Mark Ferrell was the only U.S. soldier who was injured in

the attack, but the second VBIED – from which the defendant's fingerprints were recovered – would have caused "catastrophic" damage and mass casualties, had it been successfully detonated.  (Tr. 813-17).  As such, the defendant's role in this attack, even on its own, would merit a lengthy prison sentence.

However, as the government established at trial, the defendant's criminal conduct went well beyond the FOB Chapman attack, and included an extended period of membership in and material support to al-Qaeda.  Another former al-Qaeda member, Sufwan Murad, testified that the defendant was a member of al-Qaeda's external operations group, which targeted Europe and the United States.  (Dep. Tr. 44).  Working in that group, the defendant initially assisted al-Qaeda leader Abdul Hafeez, and later took over Abdul Hafeez's work after his death.  (Dep. Tr. 48).  This work included receiving cash payments intended for distribution to other al-Qaeda external operations group members.  (Dep. Tr. 49-51).  Later, the defendant continued to correspond with other al-Qaeda members.  As late as 2013, the defendant was still discussing his desire to fight jihad.  (GX 708).

In sum, the defendant was a senior and longtime member of al-Qaeda, and he helped to mount an attack against a U.S. base in Afghanistan that would have been catastrophic had it been carried out as intended.  The seriousness of his conduct, and the corresponding need for a significant sentence, cannot be overstated.

III.    A Sentence of Life Imprisonment is Appropriate to Serve the Purposes of
        Specific and General Deterrence

A sentence of life imprisonment in this case is also necessary "to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  Indeed, the need for deterrence is especially important in the context of a terrorism offense.  Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult.  See, e.g., United States v. Meskini,

319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").  As Second Circuit Judge John M. Walker has stated, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life."  United States v. Stewart, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring).  In this case, there is a strong demand for both individual and general deterrence.

With respect to individual deterrence, the defendant has demonstrated a deeply vested commitment to waging violent jihad.  This commitment was apparent as far back as 2007, when he encouraged his family members to watch extremist propaganda (GX 819), and in the video where he entreated his friends to come watch "Lee's Life for Lies," which depicted the murder of U.S. soldiers in Iraq (GX 503).  It continued through his participation in the construction of the massive VBIED used in the FOB Chapman attack, and eventually led him to join and ascend the ranks within al-Qaeda.  Most telling on the need for individual deterrence, however, are the defendant's own words from one of his letters in 2013 (GX 708), where he expresses a desire to leave the FATA and travel next to Syria to continue his fight.  That letter reflects that even six years after he first traveled to Pakistan, the defendant retained his jihadist fervor.

Equally important in this case is general deterrence.  Simply put, the sentence imposed should send a message to all would-be terrorists that if they conspire to train and fight, and if they support al-Qaeda's call to murder Americans, they will be caught, prosecuted, and then imprisoned for life.

For all these reasons, society's interest in effective deterrence calls for total and lifelong incapacitation.

IV.     **A Sentence of Life Imprisonment Is Appropriate to Protect the Public from Further Crimes by the Defendant**

For many of the same reasons, a sentence of life imprisonment in this case is necessary "to protect the public from further crimes of the defendant."  See 18 U.S.C. § 3553(a)(2)(C).  As the government established at trial, the defendant is a longtime member of al-Qaeda.  Al-Qaeda members receive a variety of types of combat training, including regarding weapons and explosives.  (See Dep. Tr. 19-20; Tr. 1016-18).  The defendant also apparently has specialized expertise in making IEDs, as evidenced by the fact that eighteen of his fingerprints were recovered from the VBIED used in the attack on FOB Chapman.  As such, the defendant is clearly a dangerous individual, "far more sophisticated than an individual convicted of an ordinary street crime."  See United States v. Jayyousi, 657 F.3d 1085, 1117 (11th Cir. 2011) (explaining that a defendant "poses a heightened risk of future dangerousness due to his al-Qaeda training").

V.     **The History and Characteristics of the Defendant Also Support a Life Sentence**

The defendant was born in the United States and had all the benefits commensurate with U.S. citizenship.  (PSR ¶ 96).  While growing up, he resided in Jordan, Dubai and Canada, where he was raised in an "upper-income environment."  (Id. ¶¶ 98-99).  He attended college, paid for by his parents, at the University of Manitoba.  (Id. ¶¶ 105-106).  In 2007, at the approximate midpoint of his college education, the defendant dropped out of college and left for the FATA.

The defendant refused to describe for the Probation Department his activities during the period between 2007 and 2014, when he was arrested in Pakistan.  (PSR ¶ 95).

17

Nevertheless, the evidence at trial established that the defendant – irrespective of his supportive family and privileged upbringing – chose to embrace and join a notorious terrorist organization after arriving in the FATA.  Prior to traveling overseas, the defendant came to adopt a violent ideology.  He viewed and listened to extremist lectures and videos, and encouraged his friends and classmates to do the same.  (See GX 503).  Accordingly, there is nothing mitigating about the defendant's history and characteristics that would support a below-Guidelines sentence.

VI.    A Life Sentence Would Be Consistent with Sentences Imposed in Similar Cases

Given the defendant's role in a sophisticated and potentially deadly attack against a U.S. military base and his membership in and material support to al-Qaeda, a life sentence is appropriate.  Further, such a sentence is consistent with sentences imposed in other similar terrorism cases.  For example:

- United States v. Mustafa Kamel Musta ("Abu Hamza"), 04 CR 356 (KBF) (S.D.N.Y. 2015) (defendant who worked as al-Qaeda cleric and recruiter who facilitated hostage-taking in Yemen, sentenced to life imprisonment);

- United States v. Sulaiman Abu Ghayth, 98 CR 1023 (LAK) (S.D.N.Y. 2014) (al-Qaeda spokesman and son-in-law of Usama bin Laden sentenced to life imprisonment for conspiring to kill Americans and conspiring to provide material support to terrorists);

- United States v. Adis Medunjanin, 10 CR 19 (JG) (E.D.N.Y 2012) (defendant who traveled overseas and received training and direction from al-Qaeda, apprehended in connection with conspiracy to detonate bombs on New York City subways, sentenced to life imprisonment);

- United States v. Russell Defreitas, 07 CR 543 (DLI) (E.D.N.Y. 2011) (defendant involved in plot to destroy infrastructure at JFK airport, sentenced to life imprisonment);

- United States v. Faisal Shahzad, 10 CR 541 (MGC) (S.D.N.Y. 2010) (defendant sentenced to life imprisonment for failed attempt to bomb Times Square, New York);

- United States v. Mohammed Mansour Jabarah, 02 CR 1560 (BSJ) (S.D.N.Y. 2008) (defendant sentenced to life imprisonment upon a guilty plea to conspiring to bomb U.S. Embassies in Singapore and the Philippines); and

- <u>United States v. Richard Reid</u>, 02 CR 10013 (WGY) (D. Mass. 2003) (defendant sentenced to three life imprisonment terms upon a guilty plea to attempting to destroy with explosives an in-flight commercial aircraft).

     A Guidelines sentence of life imprisonment would be consistent with these and other sentences imposed on terrorists convicted of similar (and even less serious) crimes.

CONCLUSION

The defendant was born into privilege, and had every opportunity to lead a productive and law-abiding life.  Instead, he chose to embrace hatred and violence.  He tried to kill U.S. soldiers and aid workers, and joined al-Qaeda, where his U.S. citizenship allowed for his rapid advancement into the organization's elite external operations group.  He has made no effort to accept responsibility for his actions, and given his background, training and expertise, remains a dangerous individual.  Based on the advisory Guidelines and the Section 3553(a) factors, the Court should sentence the defendant to a life term of imprisonment.

Dated:      Brooklyn, New York
            January 5, 2018

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York


                             By:        ___/s/_____
                                        Richard M. Tucker
                                        Douglas M. Pravda
                                        Saritha Komatireddy
                                        Assistant United States Attorneys
                                        (718) 254-6204/6268/6054

                                        Alicia Cook
                                        Trial Attorney
                                        Counterterrorism Section